1   GEOFFREY A. HANSEN
    Acting Federal Public Defender
2   ELLEN V. LEONIDA
    Assistant Federal Public Defender
3   555 - 12th Street, Suite 650
    Oakland, CA 94607-3627
4   Telephone: (510) 637-3500
    Fax: (510) 637-3507
5   Email: ellen_leonida@fd.org

6   Counsel for Defendant
    RONALD WAYNE POWERS
7

8
                    IN THE UNITED STATES DISTRICT COURT
9               FOR THE NORTHERN DISTRICT OF CALIFORNIA
                            OAKLAND DIVISION
10

11

12   UNITED STATES OF AMERICA,          CR 12-00102 PJH

13                      Plaintiff,      **DEFENDANT'S SENTENCING
                                        MEMORANDUM**
14           v.

15   RONALD WAYNE POWERS,               HONORABLE PHYLLIS J. HAMILTON
                                        Date:        August 8, 2012
16                      Defendant.      Time:        2:30 p.m.

17

18

19

20

21

22

23

24

25

26

1

**TABLE OF CONTENTS**

2   INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3   STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

4   I.      Childhood. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

5   II.     Adult Life. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

6   III.    Offense Conduct and Enrollment in Therapy. . . . . . . . . . . . . . . . . . . . . . . . . . 5

7   IV.     Physical Limitations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

8   DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

9   I.      District Courts Have Both the Authority and the Responsibility to Exercise
10          Their Judgment and Discretion in Arriving at the Appropriate Sentence. . . . . . . 8

11  II.     This Court Should Afford the Child Pornography Guidelines Little Deference,
            Because They are Not the Product of the Sentencing Commission's Traditional
12          Empirical Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

13          A.      The dramatic and unwarranted increase in the child pornography
                    Guideline ranges is unsupported by empirical evidence. . . . . . . . . . . . . . 10

14          B.      The Guidelines enhancement for number of images was added to the
                    Guidelines directly by Congress without meaningful debate or an
15                  evidentiary basis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

16          C.      The Guidelines enhancements produced as a result of these
                    Congressional mandates result in unjustifiable double counting. . . . . . . 14

17          D.      Courts Across the Country Have Imposed Below-Guidelines Sentences
18                  Because of the Deficiencies of the Child Pornography Guidelines. . . . . . 15

19  III.    A Forty-Eight Month Sentence is Sufficient But Not Greater Than Necessary
20          in this Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

21          A.      The History and Characteristics of the Defendant Warrant a Sentence of
                    Forty-Eight Months Imprisonment (18 U.S.C. §3553(a)(1)). . . . . . . . . . . 17

22          B.      The Nature and Circumstances of the Offense Warrant a Sentence of
23                  Forty-Eight Months Imprisonment (18 U.S.C. §3553(a)(1)). . . . . . . . . . . 18

24          C.      A sentence of Forty-Eight Months Imprisonment Would Achieve the
                    Goals of Retribution, Deterrence, Incapacitation, and Rehabilitation
25                  (18 U.S.C.  §3553 (a)(2)). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

26

D.    A sentence of Forty-Eight Months Imprisonment Would Provide the Defendant With Needed Medical Care in the Most Effective Manner (18 U.S.C. §3553(a)(2)(D)). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

1

**TABLE OF AUTHORITIES**

2

**FEDERAL CASES**

3
4

*Gall v. United States*, 552 U.S. 38 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Kimbrough v. United States*, 552 U.S. 85 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Rita v. United States*, 551 U.S. 338 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 12

*United States v. Baird*, 580 F. Supp. 2d 889 (D. Neb. Jan. 11, 2008). . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Beiermann*, 599 F. Supp. 2d 1087 (N.D. Iowa 2009). . . . . . . . . . . . . . 10, 14, 16

*United States v. Booker*, 543 U.S. 220 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*United States v. Burns*, 2009 WL 3617448, (N.D.Ill. Oct.27, 2009). . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Dorvee*, 616 F.3d 174 (2nd Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . 10, 13, 15

*United States v. Grinbergs*, 2008 WL 4191145 (D. Neb. 2008). . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Grober*, 595 F. Supp. 2d 382 (D. N.J. 2008). . . . . . . . . . . . . . . . . . . . . 10, 14, 16

*United States v. Hanson*, 561 F. Supp. 2d 1004 (E.D. Wis. 2008). . . . . . . . . . . . . . . . . . . . 10, 16

*United States v. Howard*, 2010 WL 749782 (D.Neb. Mar.1, 2010). . . . . . . . . . . . . . . . . . . . . 15

*United States v. Johnson*, 588 F. Supp. 2d 997 (S.D. Iowa 2008). . . . . . . . . . . . . . . . . . . . 10, 16

*United States v. Manke*, 2010 WL 307937, (E.D.Wis. Jan.19, 2010). . . . . . . . . . . . . . . . . . . . 15

*United States v. McElheney*, 630 F. Supp. 2d 886 (E.D.Tenn. 2009). . . . . . . . . . . . . . . . . . . . . 15

*United States v. Ontiveros*, 2008 WL 2937539 (E.D. Wis. 2008). . . . . . . . . . . . . . . . . . . . . 10, 16

*United States v. Phinney*, 599 F. Supp. 2d 1037 (E.D. Wis. 2009). . . . . . . . . . . . . . . . . 10, 15, 16

*United States v. Rausch*, 570 F. Supp. 2d 1295 (D. Colo. 2008). . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Shipley*, 560 F. Supp. 2d 739 (S.D. Iowa 2008). . . . . . . . . . . . . . . . . . . . . . . . 16

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**FEDERAL STATUTES**

24
25

18 U.S.C. § 3553(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

26

1

**MISCELLANEOUS**

2

Skye Phillips, *Protect Downward Departures: Congress and the Executive's Intrusion Into Judicial Independence,* 12 J.L. & Pol'y 947, 976-984

3

(2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

4

Troy Stabenow, *Deconstructing the Mytho fof Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* (January 1, 2009). . . . . . . . . . . . . . . . . *passim*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1                                                 **INTRODUCTION**

2       Ronald Powers suffers from multiple, life-threatening medical conditions.  At forty-four, he

3 has been HIV positive for nearly twenty years.  He suffers from debilitating asthma, requiring

4 frequent hospitalizations and, occasionally, mechanical ventilation.  Additionally, he was recently

5 diagnosed with inclusion body myositis, a chronic, progressive, and incurable muscle disease that

6 causes a great deal of pain and severely restricts his mobility.  He has sleep apnea, which requires

7 him to sleep connected to a CPAP machine.  He is also on medication for stress and anxiety.

8       Despite his increasing physical infirmity, Mr. Powers has been gainfully employed

9 throughout his entire adult life, most of that time with the same company.  When he was less

10 physically impaired, he also volunteered his time at the Veteran's Administration and participated

11 in food drives, AIDS walks, and other civic projects organized by his employer.  Mr. Powers has

12 been in a committed relationship with his partner for nineteen years and letters from his friends attest

13 to his kindness, generosity, and reliability.

14       Ronald Powers became a productive member of society in the wake of a horrific childhood.

15 His parents were physically abusive, emotionally manipulative, and sexually inappropriate.  As a

16 child, Mr. Powers suffered repeated sexual abuse by multiple perpetrators.  He was so traumatized

17 by the events of his childhood that he repressed his memories of the abuse almost completely and,

18 after leaving home, avoided contact with his family for twenty years.

19       The effects of his childhood trauma manifested, however, as a compulsion to re-live his

20 abuse through images of child pornography.  In March of 2011, Mr. Powers shared images of child

21 pornography with an undercover agent through a peer-to-peer file sharing program.  In July, agents

22 searched Mr. Powers' home and located a computer containing child pornography.  Mr. Powers was

23 immediately cooperative, assuming full responsibility and giving law enforcement unrestricted

24 access to his computer and accounts.  He voluntarily talked to agents on multiple occasions and

25 assisted them in their investigation by allowing them to assume his on-line identity to locate other

26 suspects.  Moreover, Mr. Powers sought psychiatric help immediately.  He began individual

1  counseling, as well as a twelve-step program, to help him understand why he committed this offense
2  and to ensure that he never did it again.

3        Against this backdrop, the Court is required to craft and impose a sentence that is sufficient,
4  but no greater than necessary, to serve the goals of sentencing.  The child pornography guidelines,
5  as presently constituted, are ill-suited to the task.  Mr. Powers submits, and several district courts
6  have concluded, that the advisory Guideline ranges for child pornography offenses are far too high.
7  These Guidelines have been dramatically increased by amendments which were driven by the moral
8  outrage of a few individuals, rather than the reasoned consideration of the Sentencing Commission.
9  Consequently, they should be given little deference.

10       The parties negotiated a plea agreement pursuant to Rule 11(c)(1)(C).  In that agreement,
11  both sides agree that a sentence of between forty-eight and seventy months would be appropriate and
12  that any sentence within this range would be a reasonable one.  Probation asserts that the advisory
13  guideline range is higher than that to which the parties agreed.  Nonetheless, Probation recommends
14  a sentence of sixty months (representing a downward variance of eighteen months from the low end
15  of the Sentencing Guidelines advocated by Probation).  The defense contends that a sentence of four
16  years in prison for a very ill man, with a history of horrific childhood abuse and a minimal criminal
17  record, is more than sufficient to achieve the stated goals of sentencing.

18

19                              **STATEMENT OF FACTS**

20  **I.  Childhood**

21       Mr. Powers was born into a severely dysfunctional family, "in which he was verbally,
22  emotionally, physically, and sexually abused."  (Presentence Investigation Report ["PSR"]  ¶ 68;
23  *see also* Letter from Dianna Gross, Exhibit F)  Mr. Powers, his brother, and his sister were terrorized
24  throughout their childhoods.  (PSR ¶¶ 50-54, Exhibit F)  All of the children were subjected to
25  physical abuse for insignificant or imaged transgressions.  For example, Mr. Powers' sister, Dianna
26  Gross, recounts an incident that occurred when Mr. Powers was nine or ten years old:

> She [Mr. Powers' mother] screamed for all of us to get into the camper. When we did, she demanded to know who had eaten a couple of oreo cookies. No one admitted to it, so she said she was going to start beating me, and the other two would follow until someone admitted to the supposed crime. She did start hitting me, and after a few minutes, Ron admitted to eating the cookies.

(Exhibit F) Ms. Gross recounts numerous other ways in which Mr. Powers' parents abused and manipulated the children, trying to wear away at their self-esteem and to turn them against each other. (Exhibit F)

Ron Powers' parents were also sexually inappropriate throughout his childhood. They did not observe any boundaries regarding sexual touching or speech in front of the children, including leaving their door open during sex. His mother walked around the house nude, well into his adolescence. Mr. Powers was not permitted to lock the bathroom door and his parents frequently walked in on him in the bathroom. On one occasion, when the door to the bathroom was locked, his mother knocked a hole through it. (Exhibit F; Letter from Linda Covert, Exhibit G)

The Powers family has a history of sexual abuse "that has spanned four decades." (Exhibits G, F) Mr. Powers' sister was molested by her grandfather and his brother molested younger children. (PSR ¶ 53; Exhibit G) Mr. Powers' sister believes that he was molested by their mother. Mr. Powers' counselor also reveals that Mr. Powers has uncovered memories of molestation by multiple perpetrators as a child, including his mother. (PSR ¶ 53; Letter from Randy Weled, M.F.T., Exhibit C)

Mr. Powers was so traumatized by his childhood abuse that he repressed all memory of it and, until very recently, he had not had contact with any member of his family for close to twenty years. Mr. Powers' partner, Tim Taylor, reports that Mr. Powers has never spoken of his childhood during the nineteen years they have been together. (PSR ¶¶ 50-51; Exhibits C, F; Letter from Tim Taylor, Exhibit E)

## II. Adult Life

Despite the horrors of his early years, Mr. Powers grew up to be a responsible and caring

1   person.  He has been in a relationship with Tim Taylor since 1992.  They live with two dogs and

2   three cats in the Concord home they have shared for nineteen years.  (PSR ¶¶ 56-57; Exhibit E)  Mr.

3   Taylor writes:

> For someone like Ron, mild, quiet, unassuming even timid, the one
> week experience in the Oakland jail was very sobering.  I do not
> believe that Ron will ever commit ANY crime as long as he should
> live... Ron is loved by his friends and my family.  I love Ron and will
> support him.  Please know that despite the terrible situation he has
> gotten himself into he is and will be supported by friends and my
> family.

8   (Exhibit E) Mr. Taylor's parents confirm that they support Mr. Powers and have embraced him as

9   a member of their own family.  (Letter from Joel and Susan Steffen, Exhibit L)

10       In addition to Mr. Taylor, Mr. Powers has numerous friends who attest to his good character,

11   reliability, and willingness to assist them in times of need.  Alicia Dillingham, for example, describes

12   Mr. Powers as one of few friends, and someone she was able to count on in the weeks after she lost

13   her mother.  (Letter from Alicia Dillingham, Exhibit I)  Selia Washington also recounts Mr. Powers'

14   invaluable support and assistance after her son died.  (Letter from Selia Washington, Exhibit K)

15       Mr. Powers has had gainful employment his entire life, almost all of it with the same

16   company.  He began working at Mervyn's Department Store in 1995.  He worked there in various

17   capacities until Mervyn's went out of business in December of 2008.  He then immediately began

18   working for TJ Maxx.  He started as a backroom coordinator, worked several different jobs, and was

19   recently promoted to assistant manager of their Moraga store.  His coworker, Linda Harris, describes

20   Mr. Powers as a good and dependable colleague, who always gave 100% at work.  (PSR ¶¶ 79-81;

21   Letter from Linda Harris, Exhibit J)

22       In addition to his full-time employment, Mr. Powers has volunteered his time to various

23   causes.  He volunteered at the Veterans Administration Hospital in Martinez once or twice a week

24   from 2006 to 2007.  Additionally, Ms. Harris writes that Mr. Powers "would be the first to sign up

25   for volunteer activities such as cleaning up creeks, playgrounds, food drives, and the Aids Walk."

26   (PSR ¶¶ 79-81; Exhibit J)

### III. Offense Conduct and Enrollment in Therapy

When Mr. Powers was approached by the F.B.I. in July of 2011, he was immediately cooperative. He took full responsibility for the child pornography on his computer and voluntarily provided a statement to that effect. He also agreed to a subsequent interview, including a polygraph examination. He gave the agents his password, enabling them to gather evidence against him. He even signed a form agreeing to allow the agents to assume his identity and use it to track down other offenders. (PSR ¶¶ 10-16)

Mr. Powers "has an extreme amount of remorse and guilt for this crime." (Letter from Ronald Powers, Exhibit D)  Mr. Powers writes that, "there has not been a day since my first contact with the FBI that I have not had major guilt or remorse for what I have done," and doubts that he will ever be able to forgive himself for his conduct. (Exhibit D; PSR ¶¶ 67-68)  Mr. Powers' family and friends confirm that his acceptance of responsibility is genuine, complete, and on-going. (Exhibit E ("Ron has not yet forgiven himself"); Exhibit G ("he didn't ever blame his history for the charge of possessing child pornography"); Letter from Marcia Bakerjian, Exhibit H ("Ron takes full responsibility and does not try to blame others for his current situation"); Exhibit L ("Ron has made a very serious mistake in his life and has acknowledged that fact with his most sincere apology"))

Mr. Powers sought counseling immediately, long before any criminal charges were filed against him. He has been seeing a therapist, Randy Weled, since July of 2011. Getting treatment to prevent him from re-offending is so important to Mr. Powers that he has been spending half of his weekly salary to pay for the sessions with Mr. Weled, which are not covered by his health insurance. (PSR ¶¶ 67-68; Exhibits C, E)

Mr. Powers also regularly attended twelve-step meetings from July, 2011 until pre-trial services stopped him from doing so. His sponsor in that program describes a man uniquely dedicated to recovery and rehabilitation:

> Ron's openness about what he had done and his willingness to take responsibility is extremely unusual. Because there is such a high level of prolonged denial among sex offenders, it is a marker in terms

> of their ability to make effective change in themselves when they
> admit their crime and step forward to take responsibility... Ron's
> forthrightness indicated to me his willingness to confront and address
> directly his obsessive/compulsive behavior.

(Letter from James Campbell, Exhibit P)  Mr. Campbell goes on to describe the process through

which Mr. Powers came to understand the enormity of his crime and the impact child pornography

offenses have on their victims.  He is certain that Mr. Powers feels "a great deal of understanding

and personal remorse" for his actions.  *Id.*

## IV. Physical Limitations

Mr. Powers is in very poor physical health.  He is under the care of multiple physicians,

requires frequent medical appointments, and needs many different medications daily.  He has been

HIV positive for nearly twenty years.  While he is generally stable on a series of medications, his

recent T cell counts have been at the lower end of the scale.  (PSR ¶¶ 60-64; Letter from David R.

Besley, M.D., Exhibit A; Letter from Ross Edwin Armstrong, M.D., Exhibit B)

Additionally, Mr. Powers suffers from severe asthma, requiring him to take four different

medications.  His asthma has become increasingly worse over the past decade, frequently requiring

hospitalization.  He has also, on multiple occasions, required mechanical ventilation while in the

hospital.  (PSR ¶ 61; Exhibits A, B)

In  2006, Mr. Powers developed Cushing Syndrome due to a side effect of his asthma

medication.  Mr. Powers also suffers from sleep apnea and requires a CPAP machine to sleep.  He

is currently taking Lorazepam for stress and anxiety.   (PSR ¶¶ 60-64; Exhibits A, B)

Finally, Mr. Powers was recently diagnosed with inclusion body myositis, a degenerative

disorder "characterized by 'chronic, progressive muscle inflammation accompanied by muscle

weakness.'" (PSR ¶ 59; Exhibits A, B)  As a result of this disease, Mr. Powers needs a cane to walk

and suffers from chronic inflammation of his muscles.  (Exhibit A)  There is no cure.  (PSR ¶ 59)

Dr. David Besley, Associate Chief of Medicine at Kaiser in Martinez, and Mr. Powers' HIV

specialist, cautions that Mr. Powers has, "multiple and at times life threatening medical conditions."

He stresses the necessity of Mr. Powers maintaining access to appropriate medical specialists, "at the very least.. an internist, an HIV specialist, and Neurologist."  He concludes:

> Lastly, I would like to add that in the 13 years that I have known Mr. Powers he has always been a compliant and pleasant patient to look after.  He always does what he is asked to in terms of maintaining his health and it would be a great shame to undo all of the good work which has been done to maintain him in good health for lack of appropriate medical care.

(Exhibit A)   Dr. Ross Armstrong, another physician who has been treating Mr. Powers for many years, concurs: "Due to his medical condition, he is like to require continued, ongoing medical care, especially for any worsening or exacerbation of his already existing medical problems."  (Exhibit B)

## DISCUSSION

Even assuming that the total adjusted offense level in this case is twenty-eight, as Probation contends, this Court can and must exercise its independent judgment in imposing a sentence that is no greater than necessary to serve the statutory purposes of sentencing.  Because the applicable Guidelines are not the product of the Sentencing Commission acting in its appropriate institutional role, the Court should follow the lead of numerous district courts and accord the Guidelines significantly less deference and weight than empirically grounded Guidelines.  Ultimately, the factors this Court must consider under 18 U.S.C. § 3553(a) demonstrate that a sentence of forty-eight months is appropriate.

**I.     District Courts Have Both the Authority and the Responsibility to Exercise Their Judgment and Discretion in Arriving at the Appropriate Sentence**

The Supreme Court's decisions in *United States v. Booker*, 543 U.S. 220 (2005), *Kimbrough v. United States*, 552 U.S. 85 (2007), and *Gall v. United States*, 552 U.S. 38 (2007), dramatically altered the district court's role in sentencing.  The Sentencing Guidelines, "formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence."

CR 12-00102 PJH
Defendant's Sentencing Memorandum              -7-

1   *Kimbrough*, 552 U.S. at 91.  While district courts must still consult the Guidelines and take them

2   into account, they "may not presume that the Guidelines range is reasonable," *Gall*, 552 U.S. at 50;

3   *see also United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc).  After *Booker*, "[t]he

4   overarching statutory charge for a district court is to 'impose a sentence sufficient, but not greater

5   than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just

6   punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with

7   needed educational or vocational training, medical care, or other correctional treatment." *Carty*, 520

8   F.3d at 991 (quoting 18 U.S.C. § 3553(a)). The Guideline range is only one factor for the district

9   court to consider in making this judgment, and it may not be weighed more heavily than any other

10   factor. *Id.*

11        In *Gall*, the Supreme Court held that appellate courts cannot require that "a sentence that

12   constitutes a substantial variance from the Guidelines be justified by extraordinary circumstances."

13   552 U.S. at 41.  The Court likewise rejected "the use of a rigid mathematical formula that uses the

14   percentage of a departure as the standard for determining the strength of the justifications required

15   for a specific sentence."  *Id.* at 47.  Rather, it is within the district court's discretion to arrive at an

16   appropriate sentence, "whether inside, just outside, or significantly outside the Guidelines range."

17   *Id.* at 41.

18
19   **II.     This Court Should Afford the Child Pornography Guidelines Little Deference,
     Because They Are Not the Product of the Sentencing Commission's Traditional
     Empirical Process**

20
21        In formulating Guideline 2G2.2, the Sentencing Commission failed to carry out its

22   characteristic institutional role.  The Supreme Court has repeatedly emphasized the importance of

23   empiricism in promulgating Sentencing Guidelines.  *See Rita* v. *United States*, 551 U.S. 338, 349

24   (2007); *Gall*, 552 U.S. at 46 & n. 2; *Kimbrough*, 552 U.S. at 67.  When developing the original

25   Guidelines, the Sentencing Commission, unable to reconcile the varied and occasionally

26   contradictory goals of federal sentencing, eschewed philosophical debate in favor of an objective

examination of past sentences.  *Rita*, 551 U.S. at 349.  It thus adopted "an 'empirical approach,'

beginning with an empirical examination of 10,000 presentence reports setting forth what judges had

done in the past and then modifying and adjusting past practice in the interests of greater rationality,

avoiding inconsistency, complying with congressional instructions, and the like."  *Rita*, 551 U.S. at

349 (citing U.S.S.G. Ch. 1, Pt. A(3) (1988)).  The Commission is tasked with employing similarly

stringent standards in subsequent amendments to the Guidelines:

> The Commission's work is ongoing. The statutes and the Guidelines themselves foresee continuous evolution helped by the sentencing courts and courts of appeals in that process. The sentencing courts, applying the Guidelines in individual cases, may depart (either pursuant to the Guidelines or, since *Booker,* by imposing a non-Guidelines sentence). The judges will set forth their reasons. The courts of appeals will determine the reasonableness of the resulting sentence. The Commission will collect and examine the results. In doing so, it may obtain advice from prosecutors, defenders, law enforcement groups, civil liberties associations, experts in penology, and others.

*Id.* at 350.

    When the Commission follows these steps –  relying on past practice, then reviewing and

revising the guidelines in response to data and feedback from judges and others in the field – then

it may be "fair to assume" that the guideline "reflect[s] a rough approximation" of sentences that

"might achieve 3553(a) objectives," if the case is "typical."  *Rita*, 551 U.S. at 349.  However, when

Guidelines "are not based on empirical data but are instead keyed to or guided by statutory directives,

a court is not presented with the 'ordinary case,' in which 'the Commission's recommendation of

a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s

objectives.'"  *United States v. Baird*, 580 F. Supp. 2d 889, 892 (D. Neb. Jan. 11, 2008) (quoting

*Kimbrough*, 552 U.S. at 109); *see also Kimbrough*, 552 U.S. at 109-10 (When a particular Guideline

"do[es] not exemplify the Commission's exercise of its characteristic institutional role," it is

permissible for a sentencing court to conclude that the Guideline "yields a sentence 'greater than

necessary' to achieve § 3553(a)'s purposes even in a mine-run case.")  Because the child-

pornography Guidelines at issue in this case suffer from the same deficiencies as the crack

Guidelines at issue in *Kimbrough*, this Court may, and should, sentence Mr. Powers outside the Guidelines range.

### A. The dramatic and unwarranted increase in the child pornography Guideline ranges is unsupported by empirical evidence

In 1997, federal child pornography offenders received a mean sentence of 20.59 months imprisonment. Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* (January 1, 2009), attached as Exhibit O [hereafter "Stabenow"], at 2.[1] Ten years later, in 2007, the mean sentence for defendants sentenced for the same conduct was 91.30 months imprisonment, a 443% increase in the typical sentence imposed since 1997. *Id.* This was true despite the fact that approximately one-third of defendants sentenced in fiscal year 2007 received below-Guidelines sentences. *Id.* at 2-3. As Stabenow explains, the dramatic increase in sentences over the last ten years for people convicted of federal child pornography offenses was not driven by an empirically demonstrated need for consistently tougher sentencing:

> Instead, these changes are largely the consequence of numerous morality earmarks, slipped into larger bills over the last fifteen years, often without notice, debate, or study of any kind. Congressionally mandated changes were even enacted to prevent the Commission from implementing carefully considered modifications which would have *lowered* applicable offense levels.

*Id.* at 3 (emphasis in original).

In 1996, for example, the Sentencing Commission, at Congress' direction, submitted a detailed 42-page report to Congress about sex offenses against children. *Id.* at12 (discussing Report

---

[1]Numerous district courts have cited to and relied on Stabenow's paper in finding that the child pornography Guidelines should be rejected, or at least not given significant deference. *See, e.g.*, *United States v. Dorvee*, 616 F.3d 174, 185 (2nd Cir. 2010); *United States v. Phinney*, 599 F.Supp.2d 1037, 1042 (E.D. Wis. 2009); *United States v. Beiermann*, 599 F.Supp2d 1087, 1100 (N.D. Iowa 2009); *United States v. Grober*, 595 F. Supp. 2d 382, 391 (D. N.J. 2008); *United States v. Johnson*, 588 F. Supp. 2d 997, 1003 n.4 (S.D. Iowa 2008); *United States v. Ontiveros*, 2008 WL 2937539 at *8 (E.D. Wis. 2008) (unpublished); *United States v. Hanson*, 561 F. Supp. 2d 1004, 1010-11 (E.D. Wis. 2008).

1  to Congress, Sex Offenses Against Children, 1996).  Reviewing 112 child pornography cases, the

2  Commission concluded that sentences should be increased based on its conclusion that "'a

3  significant portion of child pornography offenders have a criminal history that involves the sexual

4  abuse or exploitation of children and that those with such histories are at a greater risk of

5  recidivism.'" *Id.* at 13.  Changes to the Guidelines in 1998, 2000 and 2003 were based on the

6  Commission's recommendations in the 1996 Report.  *Id.* at 13.

7  As Stabenow points out, however, the Commission's characterization of sex offenders based

8  on the small sampling in 1996 no longer holds true.  "In 2006, 79.9% of child pornography

9  defendants had no prior felonies of any kind, let alone a criminal history of past 'sexual abuse or

10  exploitation.'" *Id.* at 14 (quoting Bureau of Justice Statistics Bulletin: "Federal Prosecution of Child

11  Sex Exploitation Offenses, 2006," at 5).  Moreover, the typical defendant sentenced today under

12  U.S.S.G. § 2G2.2 has no association with the production of child pornography.  *Id.* at 14.  The

13  current child pornography Guidelines thus were designed to apply to defendants who posed a

14  substantially greater danger and risk of recidivism than the vast majority of defendants - including

15  Mr. Powers – sentenced under the Guidelines today.  *Id.* at 14-15.

16  Further, in November 2004, the Commission increased the base offense level for child

17  pornography offenses based on the five-year mandatory minimum sentences established by Congress.

18  *Id.* at 24-25; Amendment 664, U.S.S.G. App. C.

19  As a result of these new mandatory minimum penalties and the
20  increases in the statutory maxima for these offenses, the Commission
   increased the base offense level for these offenses. . . .   The
   Commission determined that a base offense level of 22 is appropriate
21  for trafficking because, when combined with several specific offense
   characteristics which are expected to apply in almost every case (*e.g.*,
22  use of a computer, material involving children under 12 years of age,
   number of images), the mandatory minimum of 60 months'
23  imprisonment will be reached or exceeded in almost every case by the
   Chapter Two calculations.

24
25  Amendment 664, U.S.S.G. App. C.  The Commission went on to explain that it increased the base

26  offense level for possession of child pornography, "because of the increase in the statutory maximum

1    term of imprisonment... and to maintain proportionality with receipt and trafficking offenses." *Id.*

2        These amendments were adopted without regard for the actual sentences being imposed by

3    judges and without any effort to understand the reasons behind district courts' departures or

4    variances. *See Rita*, 551 U.S. at 350. They were adopted without any input from prosecutors,

5    defenders, law enforcement groups, civil liberties associations, or experts in penology. *Id.* By

6    blindly incorporating the statutory mandatory minimum sentences into the child pornography

7    Guidelines, the Commission abdicated its responsibility to develop empirically based sentencing

8    ranges. *See Kimbrough*, 552 U.S. at 109.

9
10

    **B.    The Guidelines enhancement for number of images was added to the Guidelines directly by Congress without meaningful debate or an evidentiary basis**

11        One major amendment to the child pornography guidelines was adopted without any input

12    from the Sentencing Commission, not to mention a complete lack of input from judges, lawyers, and

13    experts. The Protect Act, Pub. L. No. 108-21 (2003), forced changes to the child pornography

14    Guidelines without study or evaluation. The purpose of the Protect Act was to reconcile various

15    bills, establish a nationwide Amber Alert system to be used in cases of child kidnaping, and to

16    address virtual child pornography. *Stabenow*, p. 20 (citing Skye Phillips, *Protect Downward*

17    *Departures: Congress and the Executive's Intrusion Into Judicial Independence*, 12 J.L. & Pol'y

18    947, 976-984 (2004). However, the Act ultimately resulted in dramatic increases in the Guidelines

19    for possession of child pornography:

20           As the legislation progressed, Freshman Congressman Tom Feeney
21         proposed an unrelated amendment to the bill that would directly amend various Guidelines... The technical amendments to 2G2.2 and
22         2G2.4 were a minor component of the sweeping changes contained in the amendment and no opportunity for study or research into their
23         affect was possible. Representative Feeney later admitted he was just the 'messenger' for two government officials who authored the
24         provision and *chose not to notify or consult the Sentencing Commission*.

25           Debate on the amendment was limited to twenty minutes and there is no indication that the details of the changes to 2G2.2 and 2G2.4 were
26         evaluated. The House later passed the Child Abduction Prevention

Act with the Feeney Amendment added.  Despite objections by the Sentencing Commission, the Chairman of the House Committee on the Judiciary, the Judicial Conference of the United States, and the American Bar Association, that these changes were being made without adequate review and analysis, the Protect Act became law in 2003.

*Stabenow*, p. 20 (Citations omitted) (emphasis in original).

Both the original Feeney Amendment and the final version of the Protect Act included a direct amendment to U.S.S.G. § 2G2.2 that added an increase of up to five-levels, depending on the number of images possessed.  *See* Protect Act, Pub. L. 108-21§ 401(i)(1)(B),(C); USSG § 2G2.2(b)(7).  "No research, study, body of experience, or rationale, was provided to justify the arbitrary specific enhancement amounts, nor the choice of the triggering quantities for the two to five point enhancement related to the number of images of child pornography." *Stabenow*, p. 21.  It was the first time Congress had directly amended the Sentencing Guidelines by drafting Guideline text. *Id.* at 22; *see also United States v. Dorvee*, 616 F.3d 174, 185 (2nd Cir. 2010) (Agreeing with a commentator's observation that the changes effected by the Protect Act of 2003 "evince a 'blatant' disregard for the Commission and are 'the most significant effort to marginalize the role of the Sentencing Commission in the federal sentencing process since the Commission was created by Congress.'").

This change alone, made without adequate study and review by the Commission, has a profound affect on the Guidelines computation in this case.  The PSR gives Mr. Powers a five-level enhancement based on the number of images he possessed.  (PSR ¶ 35)  Having been adopted without any research or empirical bases, this enhancement bears no logical relationship to the degree of Mr. Powers' culpability.[2]  Moreover, the fact that this enhancement applies in nearly every child

---

[2]Judge Mark Bennett, of the District Court for the Northern District of Iowa commented on the failure of this particular enhancement to distinguish the least from the worst offenders in any meaningful way:

> [W]hile drug quantity is often a reliable indicator of intent to distribute drugs, number of images is no such reliable indicator of the culpability of the conduct of a defendant convicted of a child pornography offense. *See*

pornography case makes it inherently incapable of providing a meaningful distinction between more- and less-culpable offenders. *See, e.g. United States v. Grober*, 595 F. Supp. 2d 382, 397 (D. N.J. 2008) (noting agent's testimony that each of the 180 investigations she conducted involved more than 600 images).

### C. The Guidelines enhancements produced as a result of these Congressional mandates result in unjustifiable double-counting

In this case, the Guidelines provide for multiple enhancements to Mr. Powers' sentence based on essentially two sets of facts. First, the Guidelines advocated by Probation increase the base offense twice - a total of four levels - based on the age of the children. *(*PSR ¶ 32 (two-level increase because "the material involved a prepubescent minor"), ¶ 36 (two-level increase for vulnerable victim because, being small children, they were unable to resist))

Second, the Guidelines increase the base offense level twice - a total of an additional four levels - because Mr. Powers sent images via computer. *(*PSR ¶ 33 (two-level increase for distribution because "the defendant shared his computer files with other people"), ¶ 34 (two-level increase for use of a computer because "the defendant used his Toshiba laptop computer to download, manage and share the images")) These two enhancements punish essentially the same fact: the use of the Internet. As noted above, nearly every defendant sentenced under § 2G2.2 uses a computer, and the fact of computer use says nothing about the level of relative culpability of the defendant.

The Guidelines are normally considered a cornerstone of reasonableness only because it is assumed that each section was based on research, empirical data, and input from experts. Where,

---

*Grinbergs,* 2008 WL 4191145 at *10 ("[B]ecause of the increased ability to easily and inexpensively capture and store images with computers, the number of images does not reliably provide the distinction between large-scale and small-scale child pornography purveyors that Congress and the Sentencing Commission envisioned when promulgating the enhancement.")

*United States v. Beiermann*, 599 F.Supp2d 1087, 1106-07 (N.D. Iowa 2009).

as here, the Guidelines were amended based on Congressional directives, with no research, no debate, and no input from experts or members of the Sentencing Commission, the Court should evaluate the applicable Guideline range with skepticism.

**D.      Courts Across the Country Have Imposed Below-Guidelines Sentences Because of the Deficiencies of the Child Pornography Guidelines**

Since *Kimbrough*, district courts around the country have held that the child pornography Guidelines, like the crack cocaine Guidelines discussed in that case, deserve significantly less deference.  The Second Circuit, for example, recently characterized U.S.S.G. § 2G2.2 as a Guideline "that is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires." *Dorvee*, 616 F.3d at 184. *Dorvee* cautioned that adherence to U.S.S.G. § 2G2.2 blurs all distinction between defendants who distribute child pornography to only a few people and more serious offenders who distribute it for pecuniary gain.  *Id.* at 187.  Thus, application of the Guideline creates results "fundamentally incompatible with § 3553(a)." *Id.*

Many other courts have similarly rejected the child pornography Guidelines, in whole or in part, and imposed sentences substantially lower than those called for by the Guidelines.  *See, e.g., United States v. Howard*, No. 8:08CR387, 2010 WL 749782, at *4-7 (D.Neb. Mar.1, 2010) (unpublished) (sentencing defendant to five years when low-end guideline sentence was seventeen and one half years)*; United States v. Manke*, No. 09-CR-172, 2010 WL 307937, at *4 (E.D.Wis. Jan.19, 2010) (unpublished) (where guideline range was seventy-eight to ninety-seven, sentencing defendant to six months in halfway house);  *United States v. Burns,* No. 07 CR 556, 2009 WL 3617448, at *7 (N.D.Ill. Oct.27, 2009) (unpublished)  (sentence of seventy-two months when the guidelines called for 235 - 293 months)*; United States v. McElheney,* 630 F. Supp. 2d 886, 892 (E.D.Tenn. 2009) (granting a fifty-seven month downward variance from the low end of the Sentencing Guidelines range); *United States v. Phinney*, 599 F. Supp. 2d 1037 (E.D Wis. 2009) (granting a thirty-one month downward variance from the low end of the Sentencing Guidelines

range); *United States v. Johnson*, 588 F. Supp. 2d 997, 1004 (S.D. Iowa 2008) (granting a thirty-seven month downward variance from the low end of the Sentencing Guidelines range); *United States v. Rausch*, 570 F. Supp. 2d 1295, 1298 (D. Colo. 2008) ( granting a ninety-seven month downward variance from the low end of the Sentencing Guidelines range); *United States v. Hanson*, 561 F. Supp. 2d 1004, 1009-11 (E.D. Wis. 2008) (granting a 138 month downward variance from the low end of the Sentencing Guidelines range); *United States v. Shipley*, 560 F. Supp. 2d 739, 744 (S.D. Iowa 2008) (granting a 120 month downward variance from the low end of the Sentencing Guidelines range); *United States v. Ontiveros*, 2008 WL 2937539 at *8 (E.D. Wis. 2008) (unpublished) (granting a thirty-seven month downward variance from the low end of the Sentencing Guidelines range); *see also United States v. Beiermann*, 599 F. Supp. 2d 1087, 1100 (N.D. Iowa Feb. 24, 2009) (granting a 120 month downward variance from the low end of the Sentencing Guidelines range).

In light of the unremitting, dramatic and Congressionally driven increases in the § 2G2.2 Guidelines, sentencing courts have grappled with the challenges of imposing sentences in child pornography cases that are sufficient, but not greater than necessary to achieve the goals of § 3553(a). In *Grober*, the district court even held an evidentiary hearing in an ultimately unsuccessful effort to understand "the data behind the guidelines calculation to assist it in understanding how a first offender who pleaded guilty was facing a sentence at, and above, the 20 year statutory maximum." 595 F. Supp. 2d at 384-412. In *Beiermann*, the district court rejected the Guidelines categorically and fashioned a sentence based on the § 3553(a) factors and other factors it deemed relevant to the relative culpability of the defendant, 599 F. Supp. 2d at 1105-1118, while in *Phinney*, the district court applied the pre-1991 child pornography Guidelines in an effort to achieve a fair sentence. 599 F. Supp. 2d at 1041-1046.

///

///

///

**III.    A Forty-Eight Month Sentence is Sufficient But Not Greater Than Necessary in this Case**

In light of the fundamental flaws in the child pornography Guidelines detailed above, as well as consideration of the factors enumerated in § 3553(a), Mr. Powers deserves a sentence well below the Sentencing Guideline range in this case.  Mr. Powers submits that a sentence of forty-eight months – four years – is more than sufficient to comply with the directives of  § 3553(a).

**A.    The History and Characteristics of the Defendant Warrant a Sentence of Forty-Eight Months Imprisonment (18 U.S.C. § 3553(a)(1))**

Ronald Powers overcame a truly horrific history to become a hard-working employee, a loyal partner, and a dependable friend.  Mr. Powers' childhood could easily have broken him and prevented him from ever forming healthy adult relationships.  It is a testament to his character that he grew into a man capable of having the kind of relationship he has with Mr. Taylor.  They have been together for nearly two decades.  They share a house, several pets, and a stable life together. Mr. Taylor will continue to support Mr. Powers, and will be there for him when he is released from prison.

Mr. Powers also has numerous friends who support and stand by him even after learning that he is guilty of possessing child pornography.  Given the inflammatory nature of this offense, their commitment to Mr. Powers truly attests to his character.  Their letters explain their continued support by reference to Mr. Powers' many good qualities: his dedication to his friends; his willingness to help in times of need; his kindness.

Mr. Powers' character is also evidenced in his consistent work history.  He has worked his entire adult life.  He is good at his job and has earned the respect of his colleagues, as well as several promotions.  In addition to his job, Mr. powers has, until his health precluded it, made time to do volunteer work.  He was always the first person to sign up for food drives, civic clean-up projects, and other charity events at work.  He also volunteered at the Veteran's Administration for two years.

Since this case was filed, Mr. Powers has been on electronic monitoring under the supervision of pre-trial services.  He has complied with all their directives.  He obeyed curfew, met

with his pre-trial officer when directed to, and maintained employment, even earning a promotion while this case was pending.

**B.     The Nature and Circumstances of the Offense Warrant a Sentence of Forty-Eight Months Imprisonment (18 U.S.C. § 3553(a)(1))**

Mr. Powers accepts responsibility for this crime, and he acknowledges that he deserves harsh punishment for this conduct.  However, Mr. Powers did not manufacture or sell images of child pornography, nor did he communicate with or target a child for abuse or molestation.  He cooperated with law enforcement immediately, and fully.  Mr. Powers took full responsibility and voluntarily answered all questions put to him by law enforcement, even agreeing to a subsequent lie detector test.  He then went further, allowing the agents to assume his on-line identity to attempt to locate other offenders.

Moreover, as Mr. Weled, explains, Mr. Powers' compulsion to look at child pornography was not rooted in sadism or a desire to harm children.  Rather, he was drawn to the images as a means of constantly re-living his own, repressed molestation.  (Exhibit C)  Over the past year, Mr. Powers has come to fully understand the impact of his conduct on children.  His sponsor, his partner, and his friends all attest to the genuine and profound remorse he feels for his conduct.  (Exhibits E, G, H, L, P)

Mr. Powers understands that this does not excuse his conduct in any way and he accepts full responsibility for his crime.  These circumstances are, however, relevant to an understanding of why he committed the offense and to the determination of an appropriate sentence.

**C.     A Sentence of Forty-Eight Months Imprisonment Would Achieve the Goals of Retribution, Deterrence, Incapacitation, and Rehabilitation (18 U.S.C. § 3553(a)(2))**

Section 3553(a)(2)(A) requires the Court to consider the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).  Section 3553 further requires the Court to consider whether the proposed sentence would "afford adequate deterrence to criminal conduct" and "protect

1 the public from further crimes of the defendant."  18 U.S.C. § 3553(a)(2)(B), (C).  Forty-eight

2 months imprisonment would achieve all of these goals.

3   The proposed sentence would adequately reflect the seriousness of this offense and provide

4 just punishment.  There were no threats or violence involved in the commission of this offense, nor

5 did Mr. Powers manufacture any of the images which he is charged with possessing.  He was

6 immediately remorseful and enrolled in counseling as soon as he could, committed to taking any step

7 necessary to ensure that he would not re-offend.

8   Moreover, Mr. Powers will be subjected to severe collateral consequences as a result of this

9 felony conviction.  In addition to losing his job, and having to list this conviction on future

10 applications, Mr. Powers will have to register as a sex offender for the rest of his life.  He will also

11 lose access to his treating physicians during his term of imprisonment, which will surely have a

12 deleterious effect on his health.  Forty-eight months imprisonment – in addition to the

13 aforementioned consequences of conviction – provides ample punishment for this offense.

14   A forty-eight month sentence would also deter Mr. Powers from future crimes and

15 sufficiently protect the public.  A comprehensive study by the United States Sentencing Commission

16 found that recidivism was substantially less likely for the following categories of offenders:

17
- Defendants in criminal history category I
- Older defendants

18
- Defendants who were employed in the year prior to their offense
- Defendant who have received a college education

19
- Defendants who have been married
- Defendants who have never used illegal drugs

20

21 U.S. Sentencing Comm., Measuring Recidivism: The Criminal History Computation of the Federal

22 Sentencing Guidelines (May, 2004) at 6, 11-13.  Mr. Powers presents an extremely low risk of

23 recidivism:  he is in criminal history category I; he is forty-four years old; he has been employed for

24 his entire life (PSR ¶¶ 79-81); he completed a program at Silicon Valley College and attended Diablo

25 Valley College (PSR ¶¶ 71-72); he has been in a stable relationship for nineteen years (PSR ¶56);

26 he has never used illegal drugs and rarely consumes alcohol (PSR ¶¶ 69-70).

1    Moreover, Mr. Powers took immediate steps to seek treatment and prevent a recurrence of

2  the offense.  His counselor is of the opinion that Mr. Powers does not present a danger to children

3  and will not ever possess child pornography again.  (Exhibit C)  Mr. Powers poses no danger to the

4  public.  Forty-eight months of imprisonment would be more than sufficient to protect the community

5  and deter him from any future criminal conduct.

6        **D.    A Sentence of Forty-Eight Months Imprisonment Would Provide the Defendant
          With Needed Medical Care in the Most Effective Manner (18 U.S.C. §
7          3553(a)(2)(D))**

8        Section 3552(a) also provides that the Court should consider the need for the sentence

9  imposed to provide the defendant with needed medical care "in the most effective manner."  18

10  U.S.C. § 3553(a)(2)(D).  Mr. Powers is an extremely ill man, under the care of multiple doctors.  In

11  addition to being HIV positive, he suffers from Cushing Syndrome, inclusion body myositis, and

12  debilitating asthma.  He requires a cane to ambulate and a machine to sleep, as well as a complicated

13  regimen of daily medications.  One of his treating physicians warns that Mr. Powers has "multiple

14  and at times life threatening medical conditions" and another cautions against "worsening or

15  exacerbation" of his numerous medical problems.  (Exhibits A, B) There is a very real concern that

16  prolonged incarceration will severely, and negatively, impact his physical health.

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

1

**CONCLUSION**

2      Before the Court is a forty-four year old man whose only prior conviction is a sixteen-year-

3 old misdemeanor.  He immediately accepted responsibility for his actions and endeavored to assist

4 law enforcement in their investigation.  Additionally, Mr. Powers is in extremely poor physical

5 health and requires a great deal of medical attention.  A sentence of forty-eight months imprisonment

6 and a term of supervised release would be appropriate and sufficient.  Mr. Powers further requests

7 that the Court recommend designation at the Federal Medical Center in Devens, Massachusetts, as

8 that facility has both medical staff and a sex-offender treatment program.

9 Dated: August 1, 2012

Respectfully submitted,

GEOFFREY A. HANSEN
Acting Federal Public Defender

                      /S/
ELLEN V. LEONIDA
Assistant Federal Public Defender